# In the United States Court of Appeals for the Eleventh Circuit

---

UNITED STATES OF AMERICA,
Plaintiff–Appellee,

v.

WILLIAM SPEARMAN,
Defendant–Appellant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
NO. 22-CR-80173 (Hon. Aileen M. Cannon)

---

## ANSWERING BRIEF FOR THE UNITED STATES

---

MARKENZY LAPOINTE
United States Attorney

GREGORY SCHILLER
Assistant United States Attorney
Southern District of Florida

KYLE P. REYNOLDS
WILLIAM G. CLAYMAN
Trial Attorneys
Child Exploitation and Obscenity Section
Criminal Division
U.S. Department of Justice

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

MAHOGANE D. REED
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 615-1170
mahogane.reed@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2(b), the undersigned hereby certifies that the following is a complete list of known persons and entities who have an interest in the outcome of this criminal appeal:

Adler, Andrew L.

Benjamin, James Scott

Berry, Scott G.

Boyles, Robert Preston

Cannon, Hon. Aileen M.

Caruso, Michael

Clayman, William G.

Dopico, Hector

Garrell, Matthew Branden

Good, Gregory Malcolm

Gyires, Marton

Hubbard, Meredith

Lapointe, Markenzy

Louis, Hon. Lauren

Matthewman, Hon. William

Matzkin, Daniel

Maynard, Hon. Shaniek M.

McCabe, Hon. Ryon M.

McCrae, Caroline

Reed, Mahogane D.

Reinhart, Hon. Bruce E.

Reynolds, Kyle

Rodriguez, Jr., Valentin

Rosenberg, Hon. Robin L.

Schiller, Gregory

Spearman, William

Ubieta, Alek Daniel

United States of America

/s/ Mahogane D. Reed

**STATEMENT REGARDING ORAL ARGUMENT**

The United States believes that the facts and legal arguments are adequately discussed in the briefs and that oral argument would not significantly aid the Court's decisional process. Fed. R. App. P. 34(a)(2)(C).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................... i

TABLE OF AUTHORITIES ........................................................ iv

JURISDICTIONAL STATEMENT ................................................... 1

STATEMENT OF THE ISSUES ..................................................... 1

STATEMENT OF THE CASE ........................................................ 1

    I.    Procedural History ...................................................... 1

    II.    Statement of Facts ..................................................... 2

        A.    Website A ......................................................... 3

        B.    The FBI's Investigation Into Website A and Spearman's Arrest ............................................................ 5

        C.    Spearman is Indicted and Moves to Suppress Evidence ...... 8

    III.    Rulings Under Review and Standards of Review ....................... 11

SUMMARY OF ARGUMENT ....................................................... 12

ARGUMENT ....................................................................... 14

    I.    The District Court Did Not Abuse its Discretion by Denying Spearman's Request for an Evidentiary Hearing on His Motion to Suppress. ................................................... 14

        A.    Legal Standard .................................................. 14

        B.    The Fourth Amendment generally does not apply to FLA-1's acquisition of Spearman's IP address. ................. 15

C. Spearman's allegations concerning FLA-1's acquisition of his IP address did not require the district court to conduct an evidentiary hearing. ...................................... 20

D. Spearman's more specific theory on appeal is unfounded and does not require remand for an evidentiary hearing. ...................................................................... 24

E. Spearman's remaining disagreements with the district court's ruling are without merit. ...................................... 29

F. The district court properly denied Spearman's request for a hearing because, even if there was a Fourth Amendment violation, suppression was not warranted. .... 34

II. Spearman's Guidelines Sentence of Life Imprisonment is Substantively Reasonable. ......................................................... 37

A. Factual Background ........................................................ 37

B. The district court did not abuse its discretion by imposing a Guidelines sentence of life imprisonment ........ 42

CONCLUSION .......................................................................................... 49

# TABLE OF AUTHORITIES

## Cases

*Birdsell v. United States*,
   346 F.2d 775 (5th Cir. 1965) .................................................. 21

*Bonner v. City of Prichard*,
   661 F.2d 1206 (11th Cir. 1981) (en banc) ................................. 15

*Lustig v. United States*,
   338 U.S. 74 (1949) ............................................................... 23

*Porter v. McCollum*,
   558 U.S. 30 (2009) ............................................................... 46

*Stonehill v. United States*,
   405 F.2d 738 (9th Cir. 1968) ................................... 16, 21, 22, 28

*Strickland v. Washington*,
   466 U.S. 668 (1984) ............................................................. 46

*United States v. Amedeo*,
   487 F.3d 823 (11th Cir. 2007) ............................................... 48

*United States v. Arnold*,
   263 F. App'x 507 (7th Cir. 2008) ........................................... 45

*United States v. Bachner*,
   706 F.2d 1121 (11th Cir. 1983) ............................................. 32

*United States v. Barona*,
   56 F.3d 1087 (9th Cir. 1995) ................................................. 29

*United States v. Behety*,
   32 F.3d 503 (11th Cir. 1994) ................................................. 21

*United States v. Benoit*,
   730 F.3d 280 (3d Cir. 2013) .............................................. 32, 35

*United States v. Brock*,
   433 F.3d 931 (7th Cir. 2006) ................................................... 45

*United States v. Butler*,
   39 F.4th 1349 (11th Cir. 2022)................................................. 11

*United States v. Cooper*,
   203 F.3d 1279 (11th Cir. 2000) ................................... 11, 14, 22

*United States v. Cope*,
   282 F. App'x 369 (6th Cir. 2008) ............................................ 45

*United States v. Deal*,
   237 F. App'x 909 (5th Cir. 2007) ............................................ 45

*United States v. Emmanuel*,
   565 F.3d 1324 (11th Cir. 2009)...................... 15, 16, 20, 21, 32

*United States v. Getto*,
   729 F.3d 221 (2d Cir. 2013)..................................................... 19

*United States v. Given*,
   164 F.3d 389 (7th Cir. 1999) ................................................... 46

*United States v. Griffin*,
   418 F. App'x 574 (8th Cir. 2011) ............................................ 46

*United States v. Grushko*,
   50 F.4th 1 (11th Cir. 2022) ................................................43, 44

*United States v. Haworth*,
   187 F. App'x 458 (6th Cir. 2006) ............................................ 45

*United States v. Irey*,
   612 F.3d 1160 (11th Cir. 2010) (en banc) ...........................12, 42

*United States v. Janis*,
   428 U.S. 433 (1976) ................................................................. 19

*United States v. Lee*,
   723 F.3d 134 (2d Cir. 2013)................................................16, 22

*United States v. Leon*,
468 U.S. 897 (1984) ..............................................................10, 35

*United States v. Minaya*,
827 F. App'x 232 (3d Cir. 2020) ......................................... 22

*United States v. Mitrovich*,
95 F.4th 1064 (7th Cir. 2024) ..........................................17, 20

*United States v. Moore*,
559 F. App'x 958 (11th Cir. 2014) ....................................... 44

*United States v. Morrow*,
537 F.2d 120 (5th Cir. 1976) ........................... 15, 16, 19, 20, 31

*United States v. Patterson*,
595 F.3d 1324 (11th Cir. 2010) ........................................... 42

*United States v. Peters*,
978 F.2d 166 (5th Cir. 1992) ............................................... 45

*United States v. Peterson*,
812 F.2d 486 (9th Cir. 1987) ...................................... 23, 35, 36

*United States v. Richardson,*
764 F.2d 1514 (11th Cir. 1985)................................... 15, 31, 33

*United States v. Riley*,
995 F.3d 1272 (11th Cir. 2021)............................................ 43

*United States v. Rodriguez*,
34 F.4th 961 (11th Cir. 2022) ............................................. 47

*United States v. Rodriguez*,
359 F. App'x 115 (11th Cir. 2009) ....................................... 45

*United States v. Rosenthal*,
793 F.2d 1214 (11th Cir. 1986)............................................ 21

*United States v. Sanchez*,
30 F.4th 1063 (11th Cir. 2022).......................................... 44

*United States v. Sarras,*
    575 F.3d 1191 (11th Cir. 2009)........................................................44, 48

*United States v. Shabazz,*
    887 F.3d 1204 (11th Cir. 2018)........................................................11, 42

*United States v. Smith,*
    546 F.2d 1275 (5th Cir. 1977)................................................................ 15

*United States v. Smith,*
    741 F.3d 1211 (11th Cir. 2013)................................................... 15, 34, 36

*United States v. Sneed,*
    732 F.2d 886 (11th Cir. 1984).....................................14, 25, 31, 32, 33, 34

*United States v. Snipes,*
    611 F.3d 855 (11th Cir. 2010)................................................................ 44

*United States v. Steed,*
    548 F.3d 961 (11th Cir. 2008)................................................................ 15

*United States v. Stokes,*
    726 F.3d 880 (7th Cir. 2013) ...........................................................16, 29

*United States v. Tatum,*
    515 F. App'x 857 (11th Cir. 2013) ....................................................44, 46

*United States v. Taylor,*
    736 F. App'x 216 (11th Cir. 2018) ........................................................ 44

*United States v. Theunick,*
    651 F.3d 578 (6th Cir. 2011) ................................................................ 45

*United States v. Valdivia,*
    680 F.3d 33 (1st Cir. 2012)................................................................... 20

*United States v. Young,*
    350 F.3d 1302 (11th Cir. 2003)............................................................. 17

## Statutes and Rules

18 U.S.C. § 2252A ........................................................................... 1, 8

18 U.S.C. § 3231 ............................................................................... 1

18 U.S.C. § 3742 ............................................................................... 1

28 U.S.C. § 1291 ............................................................................... 1

Fed. R. App. P. 34 ............................................................................. i

U.S.S.G. § 5H1.11 ........................................................................... 47

## JURISDICTIONAL STATEMENT

Defendant William Spearman appeals from a final judgment of conviction in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231. The court entered its judgment on January 29, 2024. Dkt.251.[1] Spearman timely filed a notice of appeal that same day. Dkt.252. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

1.      Whether the district court abused its discretion by denying without an evidentiary hearing Spearman's motion to suppress statements and evidence that he was the lead administrator of a dark-net child pornography website.

2.      Whether Spearman's within-Guidelines sentence of life imprisonment is substantively unreasonable.

## STATEMENT OF THE CASE

### I.      Procedural History

Following a conditional guilty plea in the United States District Court for the Southern District of Florida, William Spearman was convicted of engaging in a child exploitation enterprise, in violation of 18 U.S.C. § 2252A(g). Dkt.148;

---

[1] "Dkt." refers to district court docket numbers. "Br." refers to Spearman's opening brief.

Dkt.251 at 1. The district court sentenced Spearman to life imprisonment, to be followed by a life term of supervised release. Dkt.251 at 2-3.

## II.    Statement of Facts

Between 2018 and 2022, an individual operating under anonymized usernames ███████ and ████████ covertly used, and eventually led, ██ ████ ("Website A"), a darknet chatroom and forum dedicated to sharing and discussing child sexual abuse materials. As the lead administrator of Website A, ████████ became one of the foremost child pornography targets for law enforcement agencies around the world seeking to combat the creation and proliferation of child pornography.

In 2022, as the Federal Bureau of Investigation's probe into Website A was ramping up, the FBI received an arms-length, routine tip from a foreign law enforcement agency that, in the course of its own investigation into Website A, had identified the U.S.-based IP address of someone involved in managing Website A. Based in part on this information, and after undertaking its own additional investigation, the FBI traced that IP address to Spearman, who later admitted to using usernames ████████ and ████████ on Website A. The FBI arrested Spearman, and he was convicted of engaging in a child exploitation enterprise. Based in part on the conceded seriousness of his offense, the district court sentenced him to life imprisonment.

A.    Website A

Between 2017 and 2018, Website A began operating as a forum dedicated
to sharing images and videos depicting child pornography and child sexual
abuse materials. Dkt.233 at 7. Website A operated over a darknet internet
service known as Tor network. Dkt.104-1 at 6. The Tor network was designed
to facilitate anonymous communication by masking a computer user's internet
protocol ("IP") address, a unique string of characters that identifies each
internet-connected device. Dkt.104-1 at 6-7; Dkt.233 at 7. The Tor network also
enables users to operate or access websites that are accessible only within the
Tor network from anywhere in the world. Dkt.233 at 7. Traditional techniques
for identifying a device's IP address are thus largely ineffective on the Tor
network. Dkt.104-1 at 9. The network does not provide complete anonymity,
however; a user's identity and activity on the Tor network can be deanonymized
using other techniques. Dkt.104-1 at 8-9.

To access Website A, new users registered using only a unique, password-
protected username; users were not required to provide any personally
identifying information to access the website. Dkt.233 at 8. After registering,
new users were directed to ████████████ Website A's landing chatroom,
which the website described as "the starting point for [the user's] ultimate
adventure." *Id.* In ██████████, new users were invited to exchange pictures and

videos depicting child pornography and were encouraged to engage with other users about their posts. *Id*. Users were also instructed to abide by certain "[s]afety and [s]ecurity" protocols, including to "[n]ever ever share personal data (name, age[,] country, social media, gaming ID's etc)" or "nickname[s] or password[s] on on-topic sites that [users] use on social media (snapchat, facebook, instagram etc)." *Id*. at 10; *see also id*. (reminding users that "Tor was made to stay anonymous, so never unmask yourself!").

Users who posted child pornography and engaged with other users were promoted to "[m]ember" and "invited inside" Website A. Dkt.233 at 8. Once admitted, users gained access to member-only chatrooms dedicated to different genres of child sexual abuse materials. *Id*. at 7; Dkt.104-1 at 12-13. These chatrooms included ███████████ which was dedicated to "content & discussion of boys and girls 5 years old and younger"; ████████████ which was dedicated to "extreme topics" like "death/gore," bestiality, and "hurtcore," a "genre of child pornography that depicts children being tortured[,] … humiliated, … or otherwise … subjected to violence"; and ████████████ a repository of links to child pornography files without a chat feature, reserved for members who had contributed significantly to Website A and earned a ████████ ███████ Dkt.233 at 8-9. One chatroom was reserved for Website A's "staff," a

select group of users who maintained the website and moderated chatrooms. *Id*. at 9, 11.

Website A had thousands of active registered members who shared hundreds of thousands of images and videos of child pornography on Website A. Dkt.233 at 10-11. Staff members monitored the website to ensure that users followed the website's rules and posted content. *Id*. at 11. The site's administrators also made promotional decisions, including whether a user or member had shared enough child pornography to merit greater access to Website A. *Id*.

B.    The FBI's Investigation Into Website A and Spearman's Arrest

In 2020, the FBI began investigating Website A and its users, and between 2020 and 2022, the FBI had executed multiple search warrants and interviewed active users of Website A. Dkt.104-1 at 18. By June 2022, the FBI had arrested Selwyn Rosenstein, a high-ranking administrator who helped run Website A, at his home in Florida. Dkt.233 at 11. Rosenstein identified a user operating under the username ████████ as the lead administrator for Website A, Dkt.259 at 9-10, though he provided no information about ████████ or other high-ranking administrators' true identities, Dkt.233 at 15. Rosenstein also provided the FBI with the passwords to his online accounts. *Id*. The FBI assumed Rosenstein's identity and began engaging with members on Website A. *Id*. at

5

17. The FBI also deployed several court-authorized investigative techniques to identify other users of Website A. Among them was the remote-access technique, which included sending "[t]arget [f]iles" from Rosenstein's account to other Website A users. *Id*. These files were designed so that when a user downloaded and opened them, the files caused the user's computer to contact an FBI server, which then collected the user's IP address and other information about the user's device and activity. *Id*. Although the FBI had obtained a warrant authorizing it to use this method to identify various members of Website A, *see* Dkt.107-5, the individual operating as ███████████ was not identified through this technique, *see* Dkt.104 at 3.

Instead, on August 17, 2022, the FBI received two tips from ███████████ ████████████████████████████████ ("FLA-1") stating that, on August 14, 2022, the user of a specified IP address in the United States "was involved in the management" of, and "was used to access," Website A. Dkt.104 at 3 & n.3; Dkt.104-1 at 28; Dkt.104-2. FLA-1 further advised that it had "lawfully acquired" this information, though it did not disclose how it did so or provide any other information about its investigation. *See* Dkt.104-2 at 2.

Because FLA-1 had a history of providing reliable information in similar criminal investigations, the FBI followed FLA-1's tip and served an administrative subpoena on the internet service provider, which traced the IP

address FLA-1 provided to Spearman's family home in Alabama. Dkt.104-1 at 28-30; Dkt.233 at 23. The FBI also independently confirmed that someone using the internet at Spearman's home was regularly accessing the Tor network. Dkt.104-1 at 30. And the FBI compared photos of ███████████ face, body, and home, some of which it had obtained from a second foreign law enforcement agency, with publicly available photos of Spearman's body and home. Dkt.104-1 at 319. Based on that photo-comparison and other information it had gathered, the FBI concluded that Spearman was likely an administrator of Website A. Dkt.104-1 at 42.

In November 2022, FBI agents obtained and executed a search warrant for Spearman's home. Dkt.233 at 24; *see* Dkt.104-1. During the search, agents found Spearman in his garage, where he was surrounded by computers and other electronic devices. Dkt.233 at 24; Dkt.259 at 22, 66-67, 69. After he was arrested and given his *Miranda* warnings, Spearman admitted that he had used the ███████████ and ███████████ usernames on Website A; that he was one of the four main administrators of Website A, which he began accessing in early 2018; and that he maintained a large collection of child pornography at his home. Dkt.233 at 24-25. Spearman also admitted that he managed another child pornography website on the Tor network. *Id.* at 25. FBI agents obtained computer forensic evidence tying Spearman to Website A and found Website A-

related files on devices throughout Spearman's garage. *Id*. Many of Spearman's devices were user-encrypted and inaccessible, but on the devices that the agents could access and search, agents uncovered nearly 20,000 images and videos of child pornography. *Id*. at 26.

    C.    <u>Spearman is Indicted and Moves to Suppress Evidence</u>

    1.    A grand jury charged Spearman with conspiring to advertise child pornography, in violation of 18 U.S.C. § 2251(d) and (e); conspiring to distribute child pornography, in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1); and engaging in a child exploitation enterprise, in violation of 18 U.S.C. § 2252A(g). Dkt.12 at 1-3.

    2.    Spearman moved to suppress the evidence FBI agents obtained from his home, as well as his post-*Miranda* admissions to the offense conduct. Dkt.74. He argued that the FBI engaged in a joint venture with FLA-1, which acquired his Tor-protected IP address without a warrant and in violation of the Fourth Amendment. *Id.* at 1, 5. Spearman cited the "ongoing, investigative partnership between the United States and FLA-1 as it relates to online child sexual exploitation crimes," the FBI's statements in the search warrant affidavit for Spearman's home referencing a "partnership" between the FBI and FLA-1, and statements in a September 2022 FBI report describing the FBI's June 2022 "offensive technical operations" that led to identifying Spearman's address as

evidence of a joint venture. Dkt.74 at 7. Spearman also requested a hearing on his motion. Dkt.74 at 9. He contended that various factual disputes—including "whether a warrant was necessary to obtain [his] IP address, what facts underlie the search for it, and whether there was a relationship between the FBI and FLA-1 that implicates the Fourth Amendment for actions taken by FLA-1"—merited a hearing. *Id*.

The government opposed Spearman's motion, arguing that the FBI did not direct or participate in FLA-1's identification of Spearman's IP address. Dkt.104. The government explained that FLA-1's tip was consistent with "common practice" in international investigations conducted by multiple law enforcement agencies around the world, where "an investigating agency in one country that found evidence implicating a user of Website A in another country" would "share the upshot of its finding with that other country." Dkt.104 at 5; *see also* Dkt.104-1 at 27-28. The government also argued that exclusion was not warranted because the FBI relied in good faith on FLA-1's assurance that it complied with its own laws. Dkt.104 at 15. Given Spearman's failure to identify a factual dispute, the government opposed Spearman's request for an evidentiary hearing. *Id*. at 16-17.

The district court denied Spearman's suppression motion because he failed to allege facts establishing a joint venture between the FBI and FLA-1.

Dkt.146. The court explained that Spearman's allegations were "based merely on generalized references to commonplace cooperation and information-sharing that are insufficient to show that the FBI 'substantially participated' in ███████ acquisition of [Spearman's] IP address," or that FLA-1 "actually acted as an agent for the FBI." *Id.* at 8. The court explained that, "at most," the record shows "the type of standard information sharing that courts have deemed insufficient to reach 'joint venture' status." *Id.* The court further explained that "even if there were an extrapolated and speculative case to be made that FLA-1 actually acted as an agent of the FBI," the good-faith exception to the exclusionary rule applied because "there is nothing" in the warrant affidavit or in the additional attached materials "approximating any of the four … exceptions" enumerated in *United States v. Leon*, 468 U.S. 897 (1984). *Id.* at 9-10. "To the contrary," the court determined that "the lengthy affidavits detail a careful investigation based on layers of investigation by experienced agents investigating a child-exploitation website on the Tor network." *Id.* at 10. "In the end," the court concluded that "the facts are not consistent" with Spearman's "unsupported and sweeping assertion" that FLA-1 acquired Spearman's IP in partnership with the FBI. *Id.*

The district court also denied Spearman's request for an evidentiary hearing. Dkt.146 at 11. The court determined that, given the "conclusory

nature" of Spearman's motion "and his need merely to explore the possible existence of a joint venture," there were no "contested issues of fact warranting an evidentiary hearing." *Id*.

3. Spearman entered a conditional plea of guilty to engaging in a child exploitation enterprise, reserving his right to appeal the district court's denial of his motion to suppress. Dkt.148 at 1. The district court later sentenced Spearman to a Guidelines sentence of life imprisonment. Dkt.251 at 2.

## III. Rulings Under Review and Standards of Review

A. Spearman challenges the district court's denial of his request for an evidentiary hearing on his motion to suppress. Dkt.146; *see* Br. 21-46. A district court's decision whether to hold an evidentiary hearing on a motion to suppress is reviewed for an abuse of discretion. *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000).

B. Spearman also challenges his within-Guidelines sentence of life imprisonment as substantively unreasonable, contending that the district court improperly weighed the sentencing factors in 18 U.S.C. § 3553(a). Br. 46-58. This Court reviews the substantive reasonableness of a sentence for an abuse of discretion. *United States v. Butler*, 39 F.4th 1349, 1354-55 (11th Cir. 2022). "[T]he party challenging the sentence bears the burden to show that it is unreasonable in light of the record and the section 3553(a) factors." *United States v. Shabazz*,

887 F.3d 1204, 1224 (11th Cir. 2018) (brackets and internal quotation marks omitted). This Court will disturb a sentence as substantively unreasonable only if it is left with "the definite and firm conviction that the district court committed a clear error of judgment in weighing the Section 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

I.    The district court did not abuse its discretion by denying Spearman's request for an evidentiary hearing on his motion to suppress. The Fourth Amendment's warrant requirement does not apply to searches made by foreign authorities, and Spearman failed to allege facts showing that the narrow joint-venture exception applied. His speculative theory before the district court rested on barebones allegations and snippets of the record that would not support a joint venture if true. And his new theory on appeal—that the FBI took the circuitous route of providing a foreign government with access to Website A's servers and then asking that foreign government to search an American citizen's computer using an investigative technique that the FBI could have obtained a warrant to conduct—is not only more fanciful than his theory below, but is even less supported by the record. Spearman's new allegations are no basis for

assessing whether the district court should have held a hearing on his motion to suppress.

In all events, the district court properly determined that suppression would be improper here. The government relied in good faith on the detailed search warrant, including on its representation that FLA-1 lawfully acquired Spearman's IP address. And as the district court determined, any alleged constitutional violation did not approximate the circumstances for which the suppression remedy was created. There was thus no basis for the district court to hold an evidentiary hearing.

II.     The district court's sentence is substantively reasonable. The district court determined that, notwithstanding Spearman's military background and PTSD, the nature of Spearman's offense and the need for general deterrence warranted a life sentence. Spearman's contention that the district court failed to properly weigh his mitigation evidence is belied by the record and amounts to a disagreement with the weight the court gave the Section 3553(a) sentencing factors. But weighing the sentencing factors falls within the district court's sound discretion, and the district court did not abuse that discretion here. Finally, that the district court did not explicitly address Spearman's other mitigation arguments was not error. The district court acknowledged that it had considered

the Section 3553(a) factors and the parties' arguments and evidence. This was enough to render Spearman's sentence reasonable.

## ARGUMENT

## I. The District Court Did Not Abuse its Discretion by Denying Spearman's Request for an Evidentiary Hearing on His Motion to Suppress.

Spearman contends (Br. 21-46) that the district court abused its discretion by denying his request for an evidentiary hearing on his motion to suppress. But the district court properly determined that Spearman failed to raise a dispute of fact sufficient to warrant a hearing. This Court should affirm.

### A. Legal Standard

"[W]here a defendant … fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing … to receive evidence on any issue necessary to the determination of the motion." *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (quoting *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984) (per curiam)). The question is whether the allegations of the moving papers are "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." *Cooper*, 203 F.3d at 1284 (internal quotation marks omitted). Only if the factual allegations are sufficiently specific

is a hearing required. *United States v. Smith*, 546 F.2d 1275, 1280 (5th Cir. 1977).[2]

"A court need not act upon general or conclusory assertions founded on mere suspicion or conjecture, and the court has discretion in determining the need for a hearing." *United States v. Richardson,* 764 F.2d 1514, 1527 (11th Cir. 1985).

    B.   <u>The Fourth Amendment generally does not apply to FLA-1's acquisition of Spearman's IP address.</u>

The Fourth Amendment generally prohibits warrantless searches and seizures by law enforcement. *See United States v. Steed*, 548 F.3d 961, 967 (11th Cir. 2008) (per curiam). Evidence obtained in violation of the Fourth Amendment may be excluded from a criminal trial where exclusion would "deter future Fourth Amendment violations." *United States v. Smith*, 741 F.3d 1211, 1218-19 (11th Cir. 2013) (internal quotation marks omitted).

However, the Fourth Amendment and its exclusionary rule do "not apply to arrests and searches made by foreign authorities on their home territory and in the enforcement of foreign law." *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976); *see also United States v. Emmanuel*, 565 F.3d 1324, 1330 (11th Cir. 2009) (explaining that evidence obtained by "foreign officials" is generally "admissible in United States courts"). That is so "even if the search does not

---

[2] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

otherwise comply with our law, including the law of the Fourth Amendment,"
*United States v. Stokes*, 726 F.3d 880, 890 (7th Cir. 2013), and "even if the persons
arrested and from whom the evidence is seized are American citizens," *Morrow*,
537 F.2d at 139.

The logic behind this rule is that, if applied to the actions of foreign law
enforcement, "the Fourth Amendment's exclusionary rule [would] not serve the
deterrence purpose for which it was designed." *United States v. Lee*, 723 F.3d 134,
139 (2d Cir. 2013); *see also Morrow*, 537 F.2d at 139. That is, a "punitive exclusion
of the evidence" seized by foreign officials is "unlikely to influence the conduct
of foreign police," whose own criminal and legal proceedings are unaffected by
"the actions of an American court," *Morrow*, 537 F.2d at 139; *Lee*, 723 F.3d at
139 (internal quotation marks omitted), and who are otherwise not bound to
"abide by our Constitution," *Stonehill v. United States*, 405 F.2d 738, 743 (9th Cir.
1968).

Because FLA-1 acquired Spearman's IP address "in ███████" and in
compliance with its own laws, Dkt.104-2 at 2, the Fourth Amendment and its
exclusionary rule generally do not apply. *Emmanuel*, 565 F.3d at 1330; *see*
Dkt.146 at 9 (applying "the general Fourth Amendment territoriality rule"
limiting application of the exclusionary rule to domestic officials). Spearman did
not dispute this general proposition below. *See* Dkt.74 at 7.

For the first time on appeal, however, Spearman contends (Br. 24-25) that this general rule does not apply because FLA-1 "searched" his computer within the United States, not in FLA-1's own country. According to Spearman, where a foreign official's search occurs within the United States, as opposed to in its own country, the Fourth Amendment presumptively applies. Because Spearman did not raise this argument in his suppression motion below, this Court's review is for plain error. *United States v. Young*, 350 F.3d 1302, 1305 (11th Cir. 2003).

Spearman cannot show any error, much less reversible plain error, clearly demonstrating that the Fourth Amendment applied to FLA-1's search merely because it accessed information about Spearman's computer located in the United States. Spearman has failed to identify any case suggesting such a limitation, and at least one court has assumed the general rule applies in similar circumstances. *See United States v. Mitrovich*, 95 F.4th 1064, 1068 (7th Cir. 2024) (assuming the Fourth Amendment did not apply to foreign officials' search of the defendant's U.S.-based computer). In any event, Spearman's claim fails on the merits.

First, Spearman's theory about how FLA-1 acquired his IP address is entirely speculative. The record does not reveal how FLA-1 acquired Spearman's IP address, let alone suggest that FLA-1 used the remote-access technique or a target file to search his computer to acquire it. *See* Dkt.104-2 at 2.

Indeed, there are several technological and non-technological ways that FLA-1 could have deanonymized Spearman's Tor-protected IP address without using the remote-access technique, including by passively monitoring Website A's activity, or receiving information about Spearman's identity from another user. *See* Dkt.104 at 11-12 (explaining other methods of deanonymization). Given the various methods by which a Tor user's IP address might be discovered, Spearman has not established that FLA-1 could have *only* identified his IP address by searching his computer on U.S. soil.

Even if FLA-1 did acquire Spearman's IP address using a method like the remote-access technique, dispensing with the general rule would do no good here, where there is no indication that FLA-1 knew that the user who accessed and managed Website A was an American citizen present in the United States before acquiring his IP address. *See* Dkt.104-1. Given Website A's strict rules against identity disclosure, the global scope of Website A's reach, and the related international law-enforcement effort to identify its users, *see* Dkt.104-1 at 27; Dkt.233 at 10, there is no reason to suspect that FLA-1 knowingly searched an American citizen, let alone a citizen present on U.S. soil. To the contrary, the record supports that no one knew any then-unidentified administrator's identity or whereabouts, *see* Dkt.104-1 at 25; Dkt.233 at 15, and that, upon learning that someone in the United States used the Tor network to manage Website A, FLA-

1 shared the IP address with the FBI consistent with its "common practice" of sharing information with the "law enforcement agency in the country where the offender appears to reside," *id.* at 27-28.

It is in this context—an international investigation into a transnational website, where Website A's administrators could have been located anywhere in the world—that dispensing with the general rule based on the happenstance that Website A's lead administrator lived in the United States would disserve the purpose of the exclusionary rule. *See Morrow*, 537 F.2d at 139 (explaining that the "punitive exclusion of … evidence" is unnecessary where it would serve no deterrent effect). In these circumstances, "[n]ormal lines of communication between the law enforcement agencies of different countries are beneficial," and applying the exclusionary rule would not advance "the goal of deterring unlawful conduct by American law enforcement officials." *Id.* at 140.

Spearman's cribbed understanding of the general rule against application of the Fourth Amendment to foreign officials is also inconsistent with courts' articulations of the rule, which focus on whether "a foreign government commits the offending act," *United States v. Janis*, 428 U.S. 433, 455 n.31 (1976), not whether the foreign government's acts constituted a search of an American citizen either on American soil or abroad. *See United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013) (holding that "suppression is generally not required when the

evidence at issue is obtained by foreign law enforcement officials" (internal quotation marks omitted)); *United States v. Valdivia*, 680 F.3d 33, 51 (1st Cir. 2012) (explaining that the Fourth Amendment's exclusionary rule "does not apply to foreign searches and seizures"); *accord Morrow*, 537 F.2d at 139 (explaining that the general rule applies "even if the persons arrested and from whom the evidence is seized are American citizens"); *Mitrovich*, 95 F.4th at 1068 (suggesting that New Zealand's and Australia's unmasking of the defendant's IP address while he was present in the United States did not violate the Fourth Amendment).

Spearman contends that, at a minimum, the circumstances of his case "required the district court to hold a hearing" to "ascertain … whether the 'general rule' applied at all." Br. 25. But as explained, *supra* pp. 15-20, this question does not warrant a hearing: because FLA-1 acquired Spearman's IP address, the Fourth Amendment and its exclusionary rule generally do not apply.

C.   <u>Spearman's allegations concerning FLA-1's acquisition of his IP address did not require the district court to conduct an evidentiary hearing.</u>

To overcome the general rule against application of the Fourth Amendment to searches by foreign officials, Spearman was required to satisfy one of two "narrow" exceptions. *Emmanuel*, 565 F.3d at 1330. "The first …

provides for exclusion of the evidence if the conduct of foreign officers shocks the conscience of the American court." *United States v. Rosenthal*, 793 F.2d 1214, 1230-31 (11th Cir. 1986). "This exception is based on a federal court's inherent 'supervisory powers over the administration of federal justice.'" *Emmanuel*, 565 F.3d at 1330 (quoting *Birdsell v. United States*, 346 F.2d 775, 782 n.10 (5th Cir. 1965)). The second "provides that if American law enforcement officials substantially participate in the foreign search, or if the foreign authorities actually conducting the search were acting as agents for their American counterparts, the exclusionary rule can be invoked." *Rosenthal*, 793 F.2d at 1231. But not just any acts will do: the acts of participation must be "so substantial" as to convert the foreign search into a joint venture. *United States v. Behety*, 32 F.3d 503, 510-11 (11th Cir. 1994); *see also Stonehill*, 405 F.2d at 744. Spearman only raised the second exception in the district court.[3]

The district court properly determined, based on Spearman's allegations and the record as a whole, that an evidentiary hearing was not required to

---

[3] Spearman suggested in the district court that "a search on U.S. soil by foreign agents" might meet the shocks-the-conscience exception to the general rule limiting application of the Fourth Amendment's exclusionary rule to American law enforcement officers. Dkt.74 at 7 n.8. But he did not argue this point further, *id.*, and the district court determined that Spearman made "no effort to establish any … conscience-shocking behavior," thus limiting its analysis to Spearman's "joint venture" argument. Dkt.146 at 5.

resolve whether the FBI and FLA-1 were engaged in a joint venture. *Cooper*, 203 F.3d at 1285. As the district court determined, Spearman's allegations—that the FBI and FLA-1 were engaged in an "ongoing, investigative partnership," that the FBI and FLA-1 "routinely shared evidence with each other," that the FBI case agent "acknowledged the 'partnership' between" the FBI and FLA-1 that "led to Mr. Spearman's ultimate identification," and that FBI reports referred to the "'offensive technical operations'" that led to identifying Spearman's IP address, Dkt.74 at 7-8; Dkt.107 at 2-3—were insufficient to establish a joint venture. These allegations "show[] at most the type of standard information sharing that courts have deemed insufficient to reach 'joint venture' status for purposes of that narrow exception." Dkt.146 at 9. Indeed, Spearman identifies no decision finding a joint venture primarily based on allegations that American law enforcement "shared evidence" or acknowledged a "partnership" with a foreign counterpart. *See Lee*, 723 F.3d at 139-41 (rejecting argument that "formalized collaboration between the DEA and" foreign officials "rendered the latter 'virtual agents' of American law enforcement in the context of … parallel investigations"); *Stonehill*, 405 F.2d at 746 ("Clearly, the giving of information, without more, does not amount to participation or make a later search a joint venture."); *United States v. Minaya*, 827 F. App'x 232, 236-37 (3d Cir. 2020) ("foreign law enforcement officials sharing information gleaned from their own

activities with United States authorities—even if cloaked in cooperative terms in agency reports—is not indicative of an impermissible joint venture"). Because nothing in the record established a joint venture, the district court properly denied Spearman's request for an evidentiary hearing.

*Lustig v. United States*, 338 U.S. 74 (1949), and *United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987), are not to the contrary. *See* Br. 37. Each case involves the federal government's actual participation in a state or foreign sovereign's criminal investigation to an extent that suggested a relationship akin to a joint venture. For example, in *Lustig*, 338 U.S. at 79 (plurality opinion), a federal official effectively employed state officers in his own investigation, such that state officers "concerned themselves especially with turning up evidence of violations of … federal counterfeiting laws" to aid the federal official, who "exercised an expert's discretion in selecting or rejecting evidence that bore on counterfeiting." And in *Peterson*, 812 F.2d at 490, the DEA "assumed a substantial role in" a foreign authority's case: "[t]he DEA was involved daily in translating and decoding intercepted transmissions, as well as advising the [foreign] authorities of their relevance." Based on the DEA's participation, the court could not "conclude that the DEA's role was subordinate to the role of [the foreign] authorities." *Id*. Neither case presents analogous circumstances.

D. **Spearman's more specific theory on appeal is unfounded and does not require remand for an evidentiary hearing.**

To overcome the deficiencies in his allegations below, Spearman attempts to flesh out a joint-venture theory on appeal. He contends that after the FBI arrested Rosenstein and gained access to his account and Website A's servers, the FBI gave FLA-1 access to Website A's servers, and then "directed" FLA-1 to send Spearman a target file using the remote-access technique the FBI had lawfully used to obtain other users' IP addresses. Br. 31-37.

Spearman's new theory is even more speculative than the one he advanced in the district court. There is nothing in the record suggesting that the FBI asked FLA-1 to do anything at all, much less that the FBI provided FLA-1 with the tools to search the computer of an American citizen on American soil. Everything in the record shows that FLA-1 shared Spearman's IP address as part of routine information sharing in an international criminal investigation. Dkt.104-1 at 25-27.

More than that, Spearman does not explain why the government would need to employ a foreign government to conduct a search that the FBI could have obtained a warrant to conduct itself. Spearman acknowledges the government had obtained a warrant to search Website A users' computers using the very remote-access technique that Spearman speculates the FBI employed FLA-1 to undertake. Dkt.107-3; Dkt.107-5. There is no reason the FBI could not

have obtained Spearman's information using that same technique.[4] That FLA-1 obtained Spearman's identifying information before the FBI does not undermine the validity and reliability of FLA-1's tip.

At a minimum, however, Spearman's new theory provides no basis for determining that the district court should have held an evidentiary hearing on his motion to suppress—an inquiry that turns on the "allegations" made, and any evidence offered, below. *See Sneed*, 732 F.2d at 888. As the district court explained, Spearman's claim below turned on disparate snippets from the record, which he says showed that FLA-1 "partnered" with the FBI to identify his IP address. But Spearman failed to explain his theory of how the FBI allegedly partnered with FLA-1, let alone with the level of specificity that he offers this Court. *Sneed*, 732 F.2d at 887 (requiring that a defendant's suppression allegations be "sufficiently definite, specific, detailed and nonconjectural to

---

[4] During its investigation, the FBI obtained a remote-access warrant authorizing it to search the ██████████ and ██████████ accounts. The government did not file a copy of this warrant in the district court because Spearman did not raise his new theory below. Had Spearman argued in the district court that the FBI gave FLA-1 access to Website A's servers and directed FLA-1 to search his computer using a remote-access technique, the government would have produced the warrant authorizing a search of the ██████████ and ██████████ accounts in discovery and provided them in the district court. At a minimum, that the FBI previously received authorization to conduct such a search substantially undermines Spearman's claim that the FBI deputized a foreign government to conduct a warrantless search on its behalf.

enable the court to conclude that a substantial claim has been presented"). His attempt to revamp his suppression theory on appeal is thus unavailing.

More than that, Spearman's claim that his new theory warrants an evidentiary hearing fails on the merits.

1.    Spearman primarily relies on an FBI report from September 2022 indicating that in June 2022, the FBI engaged in an "operation" that allowed the FBI to conduct "offensive technical operations" that "eventually led" to the identification of Spearman's IP address. Br. 33. Spearman speculates that the FBI's "offensive technical operations" involved granting FLA-1 access to Website A's servers and FLA-1 sending target files to Spearman's computer, as the FBI had done to identify the IP addresses of other users of Website A. Br. 33-35; *see also* Dkt.233 at 17.

However, the term "offensive technical operations" does not mean what Spearman says it does. As the government explained below, the FBI report's reference to "offensive technical operations" refers to "court-approved warrants the FBI obtained in an effort to identify the IP addresses of users on Website A." Dkt.104 at 10. But "FLA-1 was not involved with their execution." *Id.* The September 2022 report thus cannot be read to support Spearman's theory. Neither it nor anything else in the record shows that the FBI gave FLA-1 access

to Website A's servers or that FLA-1, at the FBI's behest, used the remote-access technique to acquire Spearman's IP address.

Spearman suggests (Br. 33) that the September 2022 FBI report's omission of any mention of the FLA-1 tip suggests that the FBI was attempting to hide that the FBI employed FLA-1 to send Spearman a target file. But that makes little sense when viewed in context of the entire record, which documents various forms of routine investigative aid the FBI received from foreign law enforcement agencies, including FLA-1. *See* Dkt.104-1; Dkt.107-1.

And that the September 2022 report omits reference to FLA-1's tip is hardly significant. That report is an administrative document, the purpose of which was to make Spearman's travel records part of the FBI's investigative file. *See generally* Dkt.107-1. The report thus includes a short preamble about some of the FBI's underlying investigation into Website A and its own efforts to identify the website's users. Dkt.107-1 at 1-2. But that document is not intended to memorialize all of the FBI's investigative findings. That much is clear from the face of the document, whose two-page summary hardly mentions *any* details about Website A or the FBI's extensive investigation into the site and its users. Nor does the report document other information obtained from foreign law enforcement agencies, including that the FBI obtained some of the pictures it used to confirm Spearman's identity from a foreign government. *See* Dkt.104-1

at 31. The report thus offers no support to Spearman's claim. If anything, the report's omission of facts detailing cooperation between the FBI and FLA-1 confirms what the record otherwise demonstrates: that the two law enforcement agencies were operating independently, not through a joint investigation. The report thus did not warrant a hearing.

Spearman contends (Br. 35-36) that FLA-1's tip itself is consistent with his theory that the FBI directed FLA-1 to send a target file to Spearman's computer for the purpose of acquiring his IP address. But it is unclear how the tip supports Spearman's theory. As Spearman acknowledges (Br. 35), the tip is "bare": it discloses nothing about how FLA-1 acquired Spearman's IP address, other than it did so in compliance with ▮▮▮ law. Dkt.104-2 at 2. Spearman points (Br. 35) to the tip's reference to "the case"—an apparent reference to the FBI's investigation into Website A and its users—as evidence that FLA-1 was cooperating with the FBI. This likewise is unavailing. The record suggests that the FBI and FLA-1 had been sharing information about their respective investigations into Website A, among other child pornography websites, before FLA-1 provided the tip containing Spearman's IP address. *See* Dkt.104-1 at 27-29. Such information sharing and knowledge about each other's investigations does not amount to a joint venture, *Stonehill*, 405 F.2d at 746, and was thus no basis for a hearing on Spearman's suppression motion.

In all, the record is inconsistent with Spearman's speculative claim that the FBI employed FLA-1 as an agent to conduct a search for his IP address. This case is thus nothing like *Stokes*, 726 F.3d at 885-86, where the government acknowledged that it had searched the defendant's home in Thailand pursuant to a "joint operation with the Royal Thai Police." Nor is it like *United States v. Barona*, 56 F.3d 1087, 1094 (9th Cir. 1995), where "American agents requested the wiretaps, information obtained [by foreign officials] was immediately forwarded to them, and throughout the surveillance [an] interpreter was provided by the United States." As the district court determined, Spearman's request for a hearing was nothing more than a "need merely to explore the possible existence of a joint venture." Dkt.146 at 11. His assertions, "accepted as true, are insufficient to produce any contested issues of fact warranting an evidentiary hearing." *Id*. The speculative framing that Spearman adds to those assertions on appeal does not alter that result.

E.  <u>Spearman's remaining disagreements with the district court's ruling are without merit.</u>

Spearman's remaining criticisms of the district court's decision are meritless.

1.  Spearman contends (Br. 38) that the district court, operating under the "mistaken[] belie[f]" that he was relying on "generalized references to commonplace cooperation" between the FBI and FLA-1 to support his motion,

failed to consider the record as a whole. But the gist of Spearman's allegations before the district court was that "because of the ongoing, investigative partnership between the United States and FLA-1," FLA-1 "acted as an agent of the FBI." Dkt.74 at 7; *see generally* Dkt.74; Dkt.107. Spearman cited disparate parts of the record discussing the alleged partnership between the FBI and FLA-1, vaguely invoked the FBI's references to its own "offensive technical operations," and quickly discussed the FBI's purported failure to suggest that FLA-1 "independently" identified his IP address as evidence of a joint venture. Dkt.107 at 2-3 (internal quotation marks omitted). As the district court determined, Spearman's allegations were insufficient to warrant relief or a hearing. Dkt.146 at 9-11.

In any case, the district court acknowledged and analyzed the record evidence on which Spearman relied, including the warrant applications and FBI reports that the parties submitted. Dkt.146 at 7 n.4. However, the court correctly rejected Spearman's contention that these documents showed anything other than "the type of standard information sharing that courts have deemed insufficient to reach 'joint venture' status for purposes of that narrow exception." *Id.* at 9.

Spearman faults the district court for "not ask[ing]" about the June 2022 "offensive technical operations" and for failing to acknowledge that FLA-1's tip

came two months after the June 2022 search of Rosenstein's home. Br. 39. But Spearman did not clearly allege in his motion to suppress that the June 2022 "offensive technical operations" referred to the search of Rosenstein's home. Nor did he connect the June 2022 raid with how FLA-1 acquired the information underlying the tip. Because Spearman failed to develop this theory in the district court, the court was not required to investigate further, *Richardson*, 764 F.2d at 1527, and his theory is no basis for concluding that a hearing was required, *Sneed*, 732 F.2d at 888. In all events, the district court, having received both sides' arguments and reviewed the evidence submitted by the parties, considered the June 2022 "offensive technical operations" and rejected Spearman's undeveloped theory about their significance. Dkt.146 at 3, 7 n.4, 9.

2.      Spearman argues (Br. 41-43) that the district court erred by placing on him the burden to prove a joint venture at all. He contends that because his IP address was obtained without a warrant, the government was required to prove that it was obtained pursuant to an exception to the warrant requirement. He is wrong.

As explained above, the Fourth Amendment's warrant requirement does not apply where the evidence was obtained by a foreign official. *Morrow*, 537 F.2d at 139. Thus, the government did not bear the burden to prove that the evidence was obtained pursuant to an exception to the warrant requirement.

Rather, it was Spearman's burden—as the movant and as the person requesting an evidentiary hearing on his motion—to show that the "narrow" joint-venture exception applied. *Emmanuel*, 565 F.3d at 1330; *see United States v. Bachner*, 706 F.2d 1121, 1127 (11th Cir. 1983) ("[T]he proponent of the motion to suppress[] ha[s] the burden of establishing that his own [F]ourth [A]mendment rights were violated by the challenged search and seizure."); *see also United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013) (rejecting defendant's argument that the government is required to establish that a foreign official obtained evidence in a manner consistent with the Fourth Amendment); *cf. Emmanuel*, 565 F.3d at 1331 (explaining that the defendant had the burden to show that he is entitled to the protections of the Fourth Amendment). Only once a defendant has established a basis for his motion does the burden shift to the government to show the search was reasonable. *See Bachner*, 706 F.3d at 1126. The district court properly determined that Spearman failed to meet his burden here.

Spearman contends that placing the burden of proving a joint venture on him "underscore[s] why an evidentiary hearing was needed," because it is difficult to prove a joint venture without one. Br. 43. But the need for a hearing only arises where a defendant alleges sufficient, non-speculative facts that might would warrant relief. *Sneed*, 732 F.2d at 888. Notwithstanding Spearman's insistence (Br. 43) that his allegations were sufficient, the district court properly

determined that the "conclusory nature" of his allegations fell short. Dkt.146 at 11.

3.     Finally, Spearman contends (Br. 39-40) that the district court erred by faulting him for not submitting declarations, affidavits, or other evidence suggesting a joint venture, rather than relying on the evidence submitted by the parties. Not so. The district court determined that the evidence submitted by the parties did not support Spearman's speculative and conclusory allegations. Dkt.146 at 9-11; *see also id.* at 7 n.4. The court's reference to Spearman's lack of proof served to underscore that Spearman failed to meet his burden to show the "applicability of the exception," *id.* at 9, which he could have done by sufficiently alleging a joint venture in his motion. *Sneed*, 732 F.2d at 887. He failed to do that here.

At bottom, Spearman suggests that the district court was required to sift the record to fill gaps in Spearman's theory or to identify one on his behalf. But because Spearman's allegations were too conclusory and "founded on mere suspicion or conjecture," the district court did not need to do more, and its decision to forego an evidentiary hearing was proper. *Richardson*, 764 F.2d at 1527.[5]

---

[5] Spearman contends that select paragraphs (31, 33, 38) in the Presentence Investigation Report (PSR) prepared for sentencing support the possibility that

F.   The district court properly denied Spearman's request for a hearing because, even if there was a Fourth Amendment violation, suppression was not warranted.

The district court correctly determined that, even assuming the FBI and FLA-1's routine communication sharing amounted to a joint venture, suppression was not warranted. Dkt.146 at 9-10.

This Court has recognized that "[s]uppression is not an automatic consequence of a Fourth Amendment violation." *United States v. Smith*, 741 F.3d 1211, 1218-19 (11th Cir. 2013) (internal quotation marks omitted). Instead, "exclusion is a remedy of last resort, justified only where the deterrence benefits of suppression outweigh the substantial costs of ignoring reliable, trustworthy evidence bearing on guilt or innocence." *Id.* at 1219 (emphasis, brackets, and internal quotation marks omitted). Thus, the suppression of evidence is "generally not … an appropriate remedy where a Fourth Amendment violation

---

the FBI directed FLA-1 to obtain Spearman's IP address. Br. 40. But they do not. Those portions of the PSR discuss the investigative techniques and operations the FBI used to identify some users of Website A; the FBI did not use those techniques to identify Spearman. Also, the PSR was not among Spearman's moving papers. There was thus no basis for the district court to rely on the PSR to determine that Spearman was entitled to a hearing on his motion. *See Sneed*, 732 F.2d at 888 (assessing whether a hearing is required based on whether the allegations in the motion to suppress show a potential constitutional violation).

occurred despite a law enforcement officer's exercise of good faith." *Id.* (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)).

In *Peterson*, the Ninth Circuit applied the good-faith exception in the joint-venture context based on American law enforcement's reasonable reliance on foreign officials' representations that evidence was obtained in compliance with their laws. 812 F.2d at 492. The court explained that "[t]he good faith exception is grounded in the realization that the exclusionary rule does not function as a deterrent in cases in which the law enforcement officers acted on a reasonable belief that their conduct was legal." *Id.* "[P]ermitting reasonable reliance on representations about foreign law is a rational accommodation to the exigencies of foreign investigations." *Id.*

Here, the government reasonably relied on FLA-1's representation that it "lawfully acquired" Spearman's IP address. Dkt.104-2. That is especially so because FLA-1 was a "repeat-player in the United States' efforts" to investigate and prosecute child pornography crimes. *Benoit*, 730 F.3d at 285; *see* Dkt.104-1 at 26-27 (explaining that "[t]here is a long history of … FLA-1 sharing criminal investigative information with U.S. law enforcement, across disciplines and including the investigation of crimes against children"). Given the FBI's reasonable belief that FLA-1 obtained Spearman's IP address in compliance with its own laws, suppressing evidence of Spearman's role in managing one of

the world's largest child pornography sites would have no legitimate deterrent effect on any perceived law enforcement misconduct. *Smith*, 741 F.3d at 1218-19; *Peterson*, 812 F.2d at 491-92. It certainly would have no effect on FLA-1, which advised that it complied with its own laws. Dkt.104-2. And any deterrent effect on the FBI—which (as it routinely does) simply relied on FLA-1's tip, based on its unambiguous representation about the legality of its investigation—would be substantially outweighed by the social costs of suppressing unassailable evidence of Spearman's serious criminal conduct and potentially hampering the FBI's ability to act on similarly reliable tips in the future. *See* Dkt.104-1 at 29 (explaining that FLA-1's tips have "led to the identification and arrest of multiple U.S.-based child pornography producers and hands-on offenders," among other investigative benefits).

Spearman contends that the deterrence rationale undergirding the good-faith inquiry would be especially important if Spearman's allegations that the FBI used FLA-1 to circumvent the warrant requirement proved true. Br. 44. But as the district court determined, "there is nothing" in the record demonstrating that the FBI acted in bad faith or intentionally circumvented the warrant requirement. Dkt.146 at 10. "To the contrary," the record—including "the lengthy [search warrant] affidavits"—details "a careful investigation based on layers of investigation by experienced agents investigating a child-exploitation

website on the Tor network." *Id*. Just as the district court "discern[ed] no basis … to believe that application of the exclusionary rule … would yield any meaningful deterrence of unlawful or reckless police misconduct in the United States," *id*. at 10-11, this Court should do the same.

## II. Spearman's Guidelines Sentence of Life Imprisonment is Substantively Reasonable.

Spearman challenges (Br. 46-58) his within-Guidelines sentence of life imprisonment as substantively unreasonable because, he alleges, the district court failed to consider his mitigation arguments and improperly weighed the Section 3553(a) sentencing factors. But the district court properly considered the sentencing record and weighed the Section 3553(a) factors to determine that the seriousness of Spearman's offense and the need for general deterrence outweighed his mitigation arguments. Spearman's contrary contention is without merit.

### A. Factual Background

After Spearman pleaded guilty, the probation office calculated an advisory Guidelines range of life imprisonment based on Spearman's adjusted offense level of 47, four levels above the highest calculable offense level. Dkt.233 at 35, 47. The PSR recounted Spearman's mental health history, including his diagnoses for post-traumatic stress disorder, generalized anxiety disorder, and depression. *Id*. at 39-40. The PSR also explained that Spearman had served in

the United States Army for 22 years before he was honorably discharged in 2005. *Id.* at 41-42.

At Spearman's sentencing hearing (which lasted most of a full day), the district court heard testimony from five witnesses, including Dr. Amy Swan, a forensic psychologist, who testified that Spearman had experienced various traumas and was suffering from disorders that "destabilized him and led him" to Website A. Dkt.259 at 189. Dr. Swan also testified that, although Spearman showed some arousal when exposed to pictures of young girls, he was not a pedophile, and his risk of recidivism was low. *Id.* at 178-179, 183, 191.

After resolving the parties' objections to the PSR, the district court calculated an advisory Guidelines range of life based on a new adjusted offense level of 45 (reduced to 43 under the Guidelines). Dkt.259 at 225. The government recommended a within-Guidelines sentence of life imprisonment based in large part on the seriousness of Spearman's offense. *Id.* at 226-227. During the government's presentation, the district court asked for the government's views about how the court should reconcile Spearman's offense with his extensive military history and PTSD. *Id.* at 231 (the court asking, "So if you were the Court and you see 22 years of military experience, generally very positive, what are you to make of that?"); *id.* at 234 (asking the government whether it "disagree[d], for example, that [Spearman] suffers from severe

PTSD?"). The government responded that Spearman's military service is certainly "something to be honored and respected." *Id.* at 231. And it did not dispute that Spearman suffered from PTSD. *Id.* at 234. But the government maintained that these considerations did not outweigh the seriousness of his offense conduct. *Id.* at 231, 234.

Spearman's counsel argued that a life sentence was "not appropriate" based on Spearman's poor physical health, his extensive military service, his PTSD and other psychological trauma, and his low likelihood of recidivism. Dkt.259 at 241-242. Spearman's counsel acknowledged that his offense conduct was "bad" and "horrible," but he believed that "a term of years" was most appropriate. *Id.* at 244, 254-255.

After taking some time to "gather [its] thoughts and absorb the many materials," including the "hours" of "extensive testimony"; the PSR and "all of the supporting materials"; the parties' sentencing memoranda; Dr. Swan's report; the factual proffer for the plea; and "the entire record," all "against the backdrop … of the statutory factors in 3553(a)," Dkt.259 at 256, the district court sentenced Spearman to a term of life imprisonment, *id.* at 260. The court explained that it had a "difficult" time "mak[ing] sense of" his offense, but "[t]he fact" was that Spearman "ran a website dedicated to the exploitation of children," whose "very premise" was "to encourage and incentivize other

deviant individuals into posting more and more child pornography." *Id.* at 256-257. The court described as "really outstanding" Spearman's ability to "normalize" Website A and "almost treat it like a legitimate business." *Id.* at 257. The court explained that Spearman's offense—of fostering "this community of like-minded individuals" and "exploit[ing] the most vulnerable in our society, little children as young as infants and toddlers being tortured and abused"—was "off the charts." *Id.* at 257-258.

The district court also expressed concern that Spearman used and then ran Website A for five years, operating the website in a "militaristic way, almost as if [he] took what [he] learned in the military and then perverted it into" Website A's operations. Dkt.259 at 258; *see also id.* (the court expressing concern about Spearman's use of the "sophisticated knowledge of computers" and "concealment tactics" that he had gained in the military and turning it into "something that is so nefarious that it defies explanation"). "[O]n top of that," the court was concerned that Spearman "ran other child exploitation websites around the same period," which the court took to indicate that Spearman was "knee-deep in this horror." *Id.* All of that, combined with the trove of child pornography found in Spearman's home, led the district court to conclude that Spearman was interested in child pornography and was, "without a doubt, a danger to society." *Id.* at 258-259.

The court also determined that "[g]eneral deterrence" was an important consideration. Dkt.259 at 259. Given the size and scale of Website A, the court determined that "a very significant sentence [was] warranted to send a clear message that engaging in these underground communities of child exploitation is … horrific and will be penalized accordingly." *Id.*

The court next turned to Spearman's mitigation arguments. Dkt.259 at 259. The court recognized Spearman's "extensive" military record and expressed that "[i]t's hard to discount 22 years of service to his country." *Id.* The court also recognized that "there are some cases where military service would warrant [a] downward variance or a downward departure" under the Guidelines. *Id.* at 259-260. But the court did not believe that Spearman's "case is the case that warrants … that sort of downward push on account of military service" given the "unspeakable nature" of Spearman's crimes, and because Spearman "took the sophistication" that he learned in the military and "perverted it through concealment … in … the most horrible way." *Id.* at 260.

The district court next addressed Spearman's PTSD, which the court acknowledged was "clear" and "undisputed." Dkt.259 at 260. But the court determined that Spearman's offense of "running a website dedicated to the exploitation of small children" could not "be explained by PTSD." *Id.* The court thus did not consider Spearman's PTSD "as a basis to vary downward." *Id.*

Thus, after "weighing all of the factors," the court determined that a Guidelines sentence of life imprisonment was reasonable and not greater than necessary. *Id*.

Spearman objected to the district court's sentence as substantively unreasonable because "a life sentence for a military hero and someone who suffers from PTSD, as Mr. Spearman does," is greater than necessary to achieve the purposes of Section 3553(a). Dkt.259 at 268.

B.    The district court did not abuse its discretion by imposing a Guidelines sentence of life imprisonment.

Spearman cannot meet his burden of showing that his sentence is substantively unreasonable. *United States v. Shabazz*, 887 F.3d 1204, 1224 (11th Cir. 2018).[6] Spearman's role as the lead administrator of Website A, his

---

[6] Spearman suggests that his sentence is also procedurally unreasonable because the district court gave undue weight to a sentencing factor under Section 3553(a). *See* Br. 57-58. Under this Court's precedent, this question is one of substantive reasonableness, not procedural reasonableness. *United States v. Irey*, 612 F.3d 1160, 1188-89 (11th Cir. 2010) (en banc). Either way, Spearman failed to preserve a procedural challenge on this ground. *See* Dkt.259 at 268 (raising procedural reasonableness objection based on the district court's application of sentencing enhancements). Although this Court reviews the procedural reasonableness of a sentence for an abuse of discretion, *Irey*, 612 F.3d at 1186, this Court's review is for plain error where a defendant failed to object before the district court on the ground they assert on appeal, *see United States v. Patterson*, 595 F.3d 1324, 1326 (11th Cir. 2010). Because Spearman's procedural reasonableness objection below concerned the district court's calculation of his advisory Guidelines range, not the court's consideration of (or failure to consider) certain mitigation arguments, this Court's review of that claim would be for plain error and would fail for the reasons explained below.

involvement with other child pornography websites, and his personal stockpile of child pornography constituted serious offense conduct that warranted a substantial sentence. The district court reasonably determined that a within-Guidelines sentence of life imprisonment was appropriate and that Spearman's mitigation arguments were no basis for departing or varying downward. Dkt.259 at 258-260.

1.    Spearman contends that the district court gave undue weight to the seriousness of his offense and failed to "properly consider" certain mitigating factors, including his extensive military history and his troubles with PTSD and other mental ailments. Br. 46-58. His contention is belied by the record. Dkt.259 at 259-260; *see also supra* pp. 38-42. The district court expressly considered Spearman's mitigation arguments and discussed in detail why his military service and PTSD did not warrant a downward variance. Dkt.259 at 259-260.

Spearman's dispute boils down to a disagreement with the district court's weighing of the Section 3553(a) factors. But the weight due each Section 3553(a) factor is reserved to the sound discretion of the district court, which "may give greater weight to some factors over others or even attach great weight to a single factor." *United States v. Grushko*, 50 F.4th 1, 19 (11th Cir. 2022); *see also United States v. Riley*, 995 F.3d 1272, 1279 (11th Cir. 2021). This Court "will not second guess the weight (or lack thereof) that the [court] accorded to a given [Section

3553(a)] factor as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented." *Grushko*, 50 F.4th at 19 (quoting *United States v. Snipes*, 611 F.3d 855, 872 (11th Cir. 2010)) (ellipsis omitted).

Here, the district court determined that Spearman's military history and PTSD, significant as they were, did not outweigh the seriousness of Spearman's offense and general deterrence needs. Dkt.259 at 259-260. That determination is reasonable under the circumstances and should not be disturbed. *See United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir. 2009) ("Child sex crimes are among the most egregious and despicable of societal and criminal offenses, and courts have upheld lengthy sentences in these cases as substantively reasonable."). Indeed, this Court has deferred to similarly substantial sentences in cases raising similar mitigation considerations.[7]

---

[7] *See, e.g.*, *United States v. Sanchez*, 30 F.4th 1063, 1077-79 (11th Cir. 2022) (affirming sentence of life imprisonment plus a consecutive ten-year mandatory minimum where district court rejected request for a lower sentence based on the defendant's "military service" and testimony that he "suffer[ed] from bipolar disorder and depression"); *United States v. Taylor*, 736 F. App'x 216, 222-23 (11th Cir. 2018) (per curiam) (rejecting defendant's argument that the district court's significant reliance on the seriousness of the offense conduct rendered the defendant's substantial sentence unreasonable); *United States v. Moore*, 559 F. App'x 958, 961 (11th Cir. 2014) (per curiam) (affirming above-Guidelines sentence and rejecting defendant's argument that mitigating evidence, including his "military involvement," warranted a lower sentence); *United States v. Tatum*, 515 F. App'x 857, 858-59 (11th Cir. 2013) (per curiam) (deferring to the district court's determination that the defendant's military service was "not an excuse"

Spearman's reliance (Br. 49-50 & n.7) on out-of-circuit cases in which courts affirmed downward departures and variances on account of military service is misplaced. None of those cases—which largely involve less culpable conduct—undermines a district court's discretion to weigh aggravating and mitigating factors as it deems appropriate. In any event, many courts have likewise affirmed district courts' denials of downward departures and variances on account of military service.[8]

---

for his offense and affirming denial of a downward variance (internal quotation marks omitted)); *United States v. Rodriguez*, 359 F. App'x 115, 118 (11th Cir. 2009) (per curiam) (affirming substantial sentence despite defendant's argument that "his 20-year military career" warranted a sentence reduction).

[8] *See, e.g.*, *United States v. Deal*, 237 F. App'x 909, 910 (5th Cir. 2007) (per curiam) (unpublished) (affirming district court's decision to deny a downward variance where it "expressed concern that an educated man with a military background … would turn to being a felon"); *United States v. Peters*, 978 F.2d 166, 171 (5th Cir. 1992) (affirming district court decision declining to depart for defendant's military service where defendant had earned "two purple heart[ medals] and a distinguished flying cross" award, among others); *United States v. Cope*, 282 F. App'x 369, 371 (6th Cir. 2008) (per curiam) (affirming within-Guidelines sentence and denial of downward departure where district court remarked that "even individuals with [PTSD] have to take responsibility for their actions" (internal quotation marks omitted)); *United States v. Haworth*, 187 F. App'x 458, 463 (6th Cir. 2006) (within-Guidelines sentence was reasonable where district court recognized defendant's military service but concluded that the need for "adequate deterrence" weighed more heavily (internal quotation marks omitted)); *United States v. Theunick*, 651 F.3d 578, 592 (6th Cir. 2011) (affirming district court's denial of downward departure on account of military service); *United States v. Arnold*, 263 F. App'x 507, 510-11 (7th Cir. 2008) (affirming statutory maximum sentence where the court's concern for protecting the public outweighed the defendant's military service); *United States v. Brock*,

Spearman contends (Br. 49-50) that the district court's sentence is inconsistent with *Porter v. McCollum*, 558 U.S. 30, 43 (2009) (per curiam), because the court "discount[ed] to irrelevance" and to "inconsequential proportions" his military history. In *Porter*, the Supreme Court held that counsel's failure to present mitigating evidence of a defendant's military and mental health history was ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984). *Porter* did not suggest that military history demands leniency, or that failure to afford leniency on account of a defendant's military history constitutes legal error. *See* Br. 53-54. *Porter* instead supports the proposition that whether and how much military service affects a defendant's sentence is within the sound discretion of the sentencing body. *See Porter*, 558 U.S. at 43-44 (explaining that a jury "might find" a defendant's military history "mitigating"); *see also United States v. Tatum*, 515 F. App'x 857, 858-59 (11th Cir. 2013) (per curiam) (explaining that *Porter* is not inconsistent with a district

---

433 F.3d 931, 938 (7th Cir. 2006) (explaining that the district court "had good reason to be unmoved" by the defendant's military service and difficult childhood and affirming defendant's within-Guidelines sentence); *United States v. Given*, 164 F.3d 389, 395 (7th Cir. 1999) (explaining that district court's determination that defendant's military service, "although exemplary, occurred 25 years ago" and did not warrant mitigation was "well-founded"); *United States v. Griffin*, 418 F. App'x 574, 576-77 (8th Cir. 2011) (per curiam) (affirming upward variance where district court determined that defendant's prior military service and PTSD diagnosis did not outweigh the violent nature of his conduct).

court's decision to impose a within-Guidelines sentence despite military service).

Likewise, the district court's sentence is not inconsistent with U.S.S.G. § 5H1.11, which provides that military service "may be relevant" in selecting a sentence and permits courts to depart "if the military service … is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." Spearman did not request a downward departure under Section 5H1.11. *See* Dkt.259 at 243. But even if he had, whether to depart from the advisory Guidelines range was a decision committed to the district court's sound discretion. *United States v. Rodriguez*, 34 F.4th 961, 975 (11th Cir. 2022) (explaining that "the district court's decision to grant a defendant a downward departure is committed to the court's discretion"). Here, the district court properly exercised its discretion in determining that a departure on account of Spearman's military service would not have been appropriate. Dkt.259 at 259-260.

Finally, Spearman contends (Br. 58) that the district court failed to discuss—and thus failed to consider—his remaining mitigation arguments, including arguments concerning "his childhood sexual abuse, other physical and emotional disorders, age, and minimal risk of recidivism." But a district court's failure to explicitly discuss mitigation arguments does not indicate that it

"erroneously ignored or failed to consider" them. *United States v. Amedeo*, 487 F.3d 823, 833 (11th Cir. 2007). Rather, this Court treats a district court's acknowledgement that it considered the Section 3553(a) factors and the parties' arguments as "sufficient" indication that it considered a defendant's mitigation arguments, even where the court did not expressly discuss them. *Sarras*, 575 F.3d at 1219. The district court did that here. The court explained that it had reviewed the full record, "weigh[ed] all of the [Section 3553(a)] factors," and determined that a life sentence was appropriate. Dkt.259 at 260. That is "sufficient," *Sarras*, 575 F.3d at 1219 (internal quotation marks omitted), and nothing more was required.

# CONCLUSION

For these reasons, this Court should affirm Spearman's conviction and sentence.

Respectfully submitted,

| | |
|---|---|
| MARKENZY LAPOINTE<br>United States Attorney | NICOLE M. ARGENTIERI<br>Principal Deputy Assistant Attorney General |
| GREGORY SCHILLER<br>Assistant United States Attorney<br>Southern District of Florida | LISA H. MILLER<br>Deputy Assistant Attorney General |
| KYLE P. REYNOLDS<br>WILLIAM G. CLAYMAN<br>Trial Attorneys<br>Child Exploitation and Obscenity Section<br>Criminal Division<br>U.S. Department of Justice | MAHOGANE D. REED<br>Attorney, Appellate Section<br>Criminal Division<br>U.S. Department of Justice<br>950 Pennsylvania Ave., N.W.<br>Washington, DC 20530<br>(202) 615-1170<br>mahogane.reed@usdoj.gov |

AUGUST 5, 2024

## CERTIFICATE OF SERVICE

Under Federal Rule of Appellate Procedure 25(d), undersigned counsel certifies that the foregoing Answering Brief for the United States was this day served on counsel for appellant by notice of electronic filing with the Eleventh Circuit CM/ECF system.

<u>/s/ Mahogane D. Reed</u>
MAHOGANE D. REED

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,054 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point font.

/s/ Mahogane D. Reed
MAHOGANE D. REED